JOSE MANUEL BALTAZAR-MONTERROSA, aka JOSE MANUEL BALTAZAR-MONTEROSSA, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 44302

July 13, 2006                                    137 P.3d 1137

---

[11]See id.

*Jeremy T. Bosler*, Public Defender, and *Cheryl D. Bond*, Deputy Public Defender, Washoe County, for Appellant.

*George Chanos*, Attorney General, Carson City; *Richard A. Gammick*, District Attorney, and *Joseph R. Plater III*, Deputy District Attorney, Washoe County, for Respondent.

Before DOUGLAS, BECKER and PARRAGUIRRE, JJ.

## OPINION

By the Court, BECKER, J.:

In this case, we consider whether recorded police interviews with non-English-speaking defendants must be conducted by certified translators unconnected to the police department. We also consider the procedures a district court should utilize in deciding whether to admit translated statements when faced with an objection to their admission based on inaccuracies in the translation.

We conclude that police interviews need not be conducted by an independent interpreter. We further conclude that when a dispute arises over the accuracy of the translation, the district court should appoint an independent and, if available, certified interpreter to review the disputed statements and provide an independent translation. The district court should then review any alleged translation discrepancies to determine whether they fundamentally alter the context or substance of the statement. When fundamental differences exist, the statements should not be admitted. Finally, if the

district court decides to admit the statements, it must provide all versions of the statements for consideration by the trier of fact.

Here, at trial, the State and appellant, Jose Baltazar-Monterrosa, stipulated to the overall accuracy of the police translations, and the court interpreters who raised the translation issue testified that they agreed with the stipulation. On these facts, we conclude that the district court did not abuse its discretion in admitting the police interviews and that appellant's due process right to a fair trial was not violated.

Because we conclude that the admission of the statements was not error and appellant's other contentions on appeal do not warrant a reversal of the convictions, we affirm appellant's convictions.[1]

## FACTS

Paul E. Werner's body was discovered lying in the stairwell of the Americana Inn in Reno. Werner had been beaten and asphyxiated, likely by ligature. His residence key, as well as his watch and ATM/check card, which he had possessed earlier in the day according to his daughter, was found in Room 311, Baltazar-Monterrosa's room. Werner's and Baltazar-Monterrosa's DNA were found in Room 311, as well as on each other's clothing. Werner's shirt also exhibited bloody impressions in a pattern consistent with Baltazar-Monterrosa's right shoe. The DNA of a third unidentified individual was also present at the scene.

Juan Morales-Fernandez, a friend of Baltazar-Monterrosa, testified that he encountered Baltazar-Monterrosa on the evening Werner's body was discovered. Morales-Fernandez noticed blood on Baltazar-Monterrosa's clothing and testified that Baltazar-Monterrosa confessed to killing a man, taking his money, and pushing the body down the stairs. However, during Morales-Fernandez's two initial interviews with police, he did not inform them of Baltazar-Monterrosa's admission, later explaining that he was afraid of Baltazar-Monterrosa and his family and feared becoming embroiled in the situation. Nevertheless, at his third police interview, Morales-Fernandez informed police of Baltazar-Monterrosa's admission.

When Baltazar-Monterrosa and Morales-Fernandez returned to the Americana Inn in the early morning hours, the police were present. Noticing blood on Baltazar-Monterrosa's pants, the police proceeded to interview Baltazar-Monterrosa on two separate occasions at the Reno Police Department. Spanish-speaking police

---

[1]Appellant also raises the following issues: (1) prosecutorial misconduct, (2) the district court's refusal to allow defense counsel to impeach the veracity of a witness, and (3) insufficient corpus delicti evidence to support the robbery conviction.

officers interpreted for Baltazar-Monterrosa, and both interviews were videotaped. In the first interview, Baltazar-Monterrosa denied involvement in any crime. However, in the second interview, according to the interpreter's translation, Baltazar-Monterrosa eventually stated that he had participated in Werner's killing, along with another person known to him only as "Gordo." Baltazar-Monterrosa also acknowledged that he had agreed with Gordo that they were going to take Werner's money. Police unsuccessfully attempted to locate Gordo.

At trial, the videotapes of Baltazar-Monterrosa's two interviews were played for the jury, and the two police interpreters testified that, upon review, their translations were accurate. Afterwards, however, the defense raised a translation issue, noting that the court interpreters informed them that the police interpreters' translations in the video were not word-for-word and that there were additions and omissions. The district court expressed concern over the defense's failure to have a Spanish speaker review the videotapes for accuracy. The court considered declaring a mistrial, suggested that the defense have an interpreter review the tapes that afternoon, while the trial continued, to determine the extent of the inaccuracies, and scheduled a hearing on the matter the next day.

The next day the State and Baltazar-Monterrosa, in consultation with his attorneys, stipulated to the fundamental accuracy of the police translations. Specifically, the stipulation read

> As you have seen, [the detectives'] two taped interviews of Jose Baltazar utilize two police interpreters . . . . The parties stipulate and agree that the interpreters translated all of the major points of the interviews accurately. However, the interviews were not a simultaneous word-for-word translation. Simultaneous word-for-word translation is required in courtroom proceedings, but is not required in a police interview.

Both court interpreters testified that they agreed to the stipulation, and both parties declined to examine the court interpreters. The stipulation was incorporated into the jury instructions.

After deliberations, the jury found Baltazar-Monterrosa guilty of one count each of first-degree murder and robbery. Baltazar-Monterrosa now appeals.

## DISCUSSION

*Baltazar-Monterrosa's due process rights were not violated by the admission of the disputed translation statements made to the police*

On appeal, Baltazar-Monterrosa argues that he was convicted on incompetent evidence because the police interpreters' translations of his statements were made by biased officers and were inaccurate. Baltazar-Monterrosa claims that the admission of the state-

ments violated his right to a fair trial under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. We disagree.

### Police interviews of non-English-speaking defendants need not be conducted by an independent interpreter

Baltazar-Monterrosa argues that the police interpreters in this case were biased and that police interviews of non-English-speakers should be conducted by independent interpreters under NRS 50.054. We disagree.

In *Commonwealth v. Carrillo*,[2] the Superior Court of Pennsylvania refused "to adopt a *per se* rule that there is an inherent bias, and a violation of due process rights, whenever a police officer is called upon to serve as a defendant's interpreter at an interrogation." Instead, it held that a contention of bias or prejudice against, or unfairness towards, the non-English-speaking defendant "must be borne out by the record."[3]

The court arrived at its holding after examining several lines of authority. First, the court observed that the exact issue had not been fully resolved in its own jurisdiction; the most that had been said was that the decision to use an interpreter in a trial setting rested in the sound discretion of the trial judge.[4] Second, the court noted that the Pennsylvania Legislature specifically mandated, via statute, the presence of a certified interpreter when interrogating a deaf individual but did not extend such a requirement to non-English-speakers.[5] The court interpreted this as reflective of the legislature's specific intention not to do so.[6] Third, the court noted that a number of other jurisdictions, both state and federal, held that trial courts commit no reversible error, absent a finding of prejudice, when they appoint law enforcement officers as interpreters for non-English-speaking witnesses in a criminal case.[7] Finally, the court noted that " 'rulings on the appointment and qualifications of interpreters do not reach constitutional proportions. Whatever problems there may be with the testimony of [an interpreter] go to the sufficiency of the evidence.' "[8]

---

[2]465 A.2d 1256, 1264 (Pa. Super. Ct. 1983).

[3]*Id.*

[4]*Id.* at 1262.

[5]*Id.* (citing 42 Pa. Cons. Stat. § 8701).

[6]*Id.* at 1262-63 ("In light of the law covering the deaf, it is not presumptuous to say that the General Assembly has specifically eschewed the enactment of similar legislation in regard to non-English-speaking persons subject to interrogation.").

[7]*Id.* at 1263 (citing Charles C. Marvel, Annotation, *Disqualification, for Bias, of One Offered as Interpreter of Testimony*, 6 A.L.R.4th 158 § 2).

[8]*Id.* at 1264 (citation and emphasis omitted) (quoting *Soap v. Carter*, 632 F.2d 872, 874-75 (10th Cir. 1980) (alteration in original)).

In a footnote, the court also refused to implement, via judicial fiat, a requirement that all police forces throughout Pennsylvania have an official, certified interpreter on their staff or on-call for all non-English-speaking persons arrested and subject to interrogation. The court noted that, *inter alia*, such a rule would be costly. Furthermore, given that the legislature had promulgated such a rule for deaf persons, the court determined that it would be better to leave this matter to the legislature.[9]

We similarly conclude that police interpreters should not be presumed biased absent a showing from the record. As in Pennsylvania, a discrepancy exists in the Nevada Revised Statutes as to the qualifications of an interpreter for the deaf vis-à-vis non-English-speakers. The Nevada Legislature has provided persons with a disability the right to assistance by a qualified interpreter when being interrogated, but it has not done so for non-English-speakers. NRS 171.1538(2) specifically provides that "there must be no interrogation or taking of the statement of a person with a disability without the assistance of an interpreter who is qualified to engage in the practice of interpreting in this State pursuant to subsection 2 of NRS 656A.100." NRS 656A.100 lists the qualifications and certifications required for an interpreter for the deaf. We interpret the absence of such provisions for the interrogation of non-English-speakers as the Legislature's specific intention to "eschew[ ] the enactment of similar legislation."[10] Thus, we conclude that police interviews need not be conducted by an independent interpreter and no presumption of police bias should apply absent a showing in the record. Because Baltazar-Monterrosa simply asserts that a presumption of police bias should be applied on appeal but fails to point to any actual police bias in the record, we conclude that his argument lacks merit.

### *The district court properly admitted the translated statements when the translations were disputed*

Baltazar-Monterrosa also fails to bear his burden of proving that the police translations were fundamentally inaccurate or inadequate. Notably, the parties stipulated to the substantial accuracy of the translations, and the court interpreters agreed that any errors or omissions did not change the context or fundamental nature of the statements.

Generally, the trial court's determination to admit or exclude evidence is given great deference and will not be reversed absent

---

[9]*Id.* at 1264 n.4.

[10]*Id.* at 1263.

manifest error.[11] However, "failure to object precludes appellate review of the matter unless it rises to the level of plain error."[12] Because Baltazar-Monterrosa stipulated to the accuracy of the translations and thus did not object to their admission, a plain error review is appropriate. " 'In conducting plain error review, we must examine whether there was "error," whether the error was "plain" or clear, and whether the error affected the defendant's substantial rights.' "[13]

Interpreters are subject to qualification as experts,[14] and an expert may testify to matters within the scope of his or her special knowledge.[15] "The district court has discretion to determine the admissibility of expert testimony, and we review this decision for a clear abuse of discretion."[16] "The question of an interpreter's competence is a factual one for the trial court."[17] In making this determination, the trial court is given considerable latitude, and absent a manifest abuse of discretion, its ruling will not be disturbed on appeal.[18]

In evaluating the translation of testimony, a reviewing court asks whether the translation was adequate and accurate on the whole.[19] "Translation is an art more than a science, and there is no such thing as a perfect translation of a defendant's testimony. Indeed, in every case there will be room for disagreement among expert translators over some aspects of the translation."[20] "A defendant bears the burden of proving that the translation was inadequate."[21]

---

[11]*Qualls v. State*, 114 Nev. 900, 902, 961 P.2d 765, 766 (1998).

[12]*Anderson v. State*, 121 Nev. 511, 516, 118 P.3d 184, 187 (2005).

[13]*Id.* (quoting *Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003)).

[14]*See* NRS 50.045.

[15]*See* NRS 50.275.

[16]*Sampson v. State*, 121 Nev. 820, 827, 122 P.3d 1255, 1259 (2005).

[17]*People v. Aranda*, 230 Cal. Rptr. 498, 502 (Ct. App. 1986).

[18]*People v. Roberts*, 208 Cal. Rptr. 461, 464 (Ct. App. 1984); *cf. Mulder v. State*, 116 Nev. 1, 12-13, 992 P.2d 845, 852 (2000) (noting that whether expert testimony will be admitted, and whether a witness is qualified to be an expert, are within the district court's discretion, and the reviewing court will not disturb that decision absent a clear abuse of discretion); *Smith v. State*, 100 Nev. 570, 573, 688 P.2d 326, 328 (1984) (noting that this court will not disturb a finding of competency to testify absent a clear abuse of discretion).

[19]*State v. Sanchez-Diaz*, 683 N.W.2d 824, 835 (Minn. 2004); *State v. Mitjans*, 408 N.W.2d 824, 832 (Minn. 1987).

[20]*Mitjans*, 408 N.W.2d at 832.

[21]*Sanchez-Diaz*, 683 N.W.2d at 835 (citing *State v. Montalvo*, 324 N.W.2d 650, 652 (Minn. 1982)).

Several other courts, both at the state and federal levels, have examined cases with similar facts and issues. We analyze three cases in particular, which outline approaches that can be synthesized into a guiding template for Nevada trial courts encountering similar scenarios.

In *State v. Sanchez-Diaz*, the Supreme Court of Minnesota affirmed appellant Sanchez-Diaz's conviction, via jury verdict, of first-degree murder while committing domestic abuse and second-degree murder of an unborn child. Among other things, the court held that the admission of Sanchez-Diaz's statements to officers despite language interpretation errors was not an abuse of discretion.

On the day Sanchez-Diaz's trial was set to begin, two court-appointed interpreters who had reviewed the tapes and transcripts of the interviews indicated to the judge that significant errors were made in the translations from English to Spanish and vice versa during the interviews. The court delayed the start of trial and appointed an expert translator to listen to the tapes of the interviews and provide a new transcript.[22] The expert translator prepared a new transcript identifying both relatively minor, as well as more significant errors, and testified at length about the errors at trial.[23]

On appeal, Sanchez-Diaz asserted that the statements included forty-seven identified translation errors.[24] However, the Minnesota Supreme Court noted that a cautionary instruction regarding the translation issues was given with the introduction of the statements, the majority of the translation errors were minor, and none of the errors, whether minor or significant, changed the fundamental nature of the appellant's confession, nor compelled him to confess.[25] "Instead, the errors were pointed out to the jury through testimony, corrected transcripts, arguments, and instructions."[26] In light of these facts, the Minnesota high court determined that the trial court did not commit a clear abuse of discretion and did not deny Sanchez-Diaz his due process right to a fair trial.[27]

In *United States v. Font-Ramirez*,[28] the United States Court of Appeals for the First Circuit determined that the district court did not abuse its discretion in admitting a tape recording of incriminating conversations among an informant and the defendants after one of the defendants raised a general objection that portions of the tape containing the defendants' side of the conversation were un-

[22]*Id.* at 828.

[23]*Id.* at 836.

[24]*See id.* at 835.

[25]*See id.* at 836.

[26]*Id.*

[27]*Id.* at 836-37.

[28]944 F.2d 42, 46-47 (1st Cir. 1991).

intelligible. The court noted that large portions of the tape, including statements by the defendants, were audible. Most relevant to the case at hand were the following statements by the court, which outline analogous facts:

> The government gave each defendant a copy of the tape well before trial and Font-Ramirez chose not to challenge the tape prior to trial [through a suppression hearing]. Under these circumstances, it was reasonable for the trial court to admit the tape and to entertain specific objections as the tape was played. Font-Ramirez raised no specific objections at trial and, similarly, raises only a general objection on appeal. Such a general objection, in circumstances where a tape is partially audible, is insufficient to highlight misleading or inaccurate portions of the tape.[29]

Similarly here, as in *Font-Ramirez*, Baltazar-Monterrosa alleges only a general objection on appeal and raised no objections at trial.

Finally, in *United States v. Taghipour*,[30] the appellant argued that the district court erred in allowing the jury to use an unredacted transcript during trial and deliberations. However, both sides had stipulated that the transcript, in which Farsi had been translated into English, was accurate. The court held that because the appellant did not question the accuracy of the transcript and made no showing of prejudice stemming from the use of the transcript during the jury deliberations, the district court did not abuse its discretion.[31]

We conclude that the procedures and burden of proof outlined in *Sanchez-Diaz*, *Font-Ramirez*, and *Taghipour* provide a good template for trial courts to use in determining the admissibility of disputed translated statements and adopt these procedures for use in Nevada. First, each party should have its own interpreters review any translated statements for discrepancies. If discrepancies exist, the admissibility of the statements should be raised in a pretrial motion to suppress. The party seeking suppression of the statements has the burden of demonstrating the inaccuracy of the statements and that it fundamentally alters the substance of the statements. Second, the district court should appoint an independent and, if available, certified court interpreter to review the translations. The district court must then consider the disputed versions of any statement to determine whether alleged inaccuracies or

---

[29]*Id.* at 47 (citation omitted).

[30]964 F.2d 908 (9th Cir. 1992).

[31]*Id.* at 910.

omissions fundamentally alter the context of the statement. If the district court concludes that the statement is admissible, counsel may raise any discrepancies through direct and cross-examination of officers who took the statement. The district court should also admit all versions of the statements and instruct the jury regarding the disputed translation issue and that they may consider the issue in deciding what weight to give the statements. Finally, the district court should ensure that a copy of each translation is preserved for the record on appeal.

Here, nothing in the record indicates that the police translations were substantially inaccurate. Baltazar-Monterrosa failed to offer any proof to that effect, either prior to trial in a suppression hearing or in the form of trial testimony by an expert translator or a transcript that highlighted inaccuracies. To the contrary, during trial, Baltazar-Monterrosa, in consultation with his attorney, stipulated to the accuracy of the translations. Furthermore, two court interpreters testified that they agreed with the stipulation to accuracy, and both the State and the defense were offered opportunities to examine the court interpreters, but both sides declined.

Because nothing in the record changes the fundamental nature of Baltazar-Monterrosa's admission, we conclude that Baltazar-Monterrosa's argument—that he was convicted on incompetent evidence because the translations were inaccurate—lacks merit. We conclude that the district court did not abuse its discretion and Baltazar-Monterrosa's due process right to a fair trial was not impaired.[32] We further note that a plain error standard of review may be more appropriate because Baltazar-Monterrosa stipulated to the accuracy of the police translations at the trial level and did not object to their admissibility. Accordingly, under a plain error standard, we conclude that there was no plain error in the record that affected Baltazar-Monterrosa's substantial rights.

*Baltazar-Monterrosa's remaining contentions on appeal*

In addition to the translation issue, Baltazar-Monterrosa asserts three other contentions of error: (1) the prosecutor engaged in

---

[32]We note that the district court judge was placed in a difficult position because the defense brought the translation issue to her attention in the middle of trial after being alerted by the court interpreters. Although the district court did not abuse its discretion in ordering a review of the videotapes and accepting the parties' stipulation, the district court should have also provided the jury with transcripts of the interviews that incorporated the neutral interpreter's corrections.

misconduct by suggesting Baltazar-Monterrosa engaged in witness intimidation, (2) the district court erred in denying Baltazar-Monterrosa the opportunity to cross-examine a witness on possible bias, and (3) insufficient evidence was presented to independently support the robbery conviction. We conclude that (1) the prosecutor's questions did not suggest witness intimidation by Baltazar-Monterrosa; (2) the district court erred in not allowing Baltazar-Monterrosa to impeach a witness during cross-examination, but such error was harmless beyond a reasonable doubt; and (3) sufficient independent corpus delicti evidence exists to support the robbery conviction.

### *The prosecutor did not engage in misconduct during the trial*

Baltazar-Monterrosa argues that the prosecutor engaged in misconduct by eliciting from Morales-Fernandez improper testimony that he was frightened of retaliation by Baltazar-Monterrosa or his family. Baltazar-Monterrosa asserts that these were improper suggestions of witness intimidation. We disagree.

We have previously noted that the prosecution's suggestions of witness intimidation by a defendant are reversible error, unless the prosecutor also presents substantial credible evidence that the defendant was the source of the intimidation.[33]

Here, in the relevant testimony, Morales-Fernandez was explaining his state of mind as to (1) why he accompanied Baltazar-Monterrosa to his room (because Baltazar-Monterrosa had confessed to killing a man), and (2) why he did not initially tell the police about Baltazar-Monterrosa's confession (because he feared Baltazar-Monterrosa would do something to him). Morales-Fernandez never testified that Baltazar-Monterrosa actually threatened him. Morales-Fernandez also testified that he was subjectively afraid of Baltazar-Monterrosa's family, but he never testified that he had any objective reasons for his fear or that the family actually threatened him. Thus, we conclude that Baltazar-Monterrosa's contention of suggested witness intimidation lacks merit, and his due process right to a fair trial was not violated.[34] Moreover, even if such testimony was improper, given the physical evidence in this case, any error would be harmless.[35]

---

[33]*See Lay v. State*, 110 Nev. 1189, 1193, 886 P.2d 448, 450-51 (1994).

[34]We have also considered Baltazar-Monterrosa's other allegations of prosecutorial misconduct, namely (1) advancing inconsistent theories, (2) disparaging defense tactics, and (3) vouching for a witness, and we conclude that they lack merit.

[35]*See Wegner v. State*, 116 Nev. 1149, 1155, 14 P.3d 25, 30 (2000) ("'An error is harmless when it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999))).

*The trial court erred by refusing to allow defense counsel to impeach the veracity of a witness, but this error was harmless beyond a reasonable doubt*

Baltazar-Monterrosa argues that the district court erred by refusing to allow the defense to ask about Morales-Fernandez's immigration status because it prevented the defense from eliciting testimony that Morales-Fernandez was threatened with deportation unless he testified against Baltazar-Monterrosa.

At trial, during the defense's cross-examination of Morales-Fernandez, an issue arose as to the relationship between Morales-Fernandez's immigration status and his credibility as a witness, specifically, whether anyone threatened him with deportation if he did not testify or if he did not testify in a particular manner. The district court noted that the matter was not clear and allowed both sides to examine Morales-Fernandez on voir dire regarding the matter. On voir dire, Morales-Fernandez testified that an INS interpreter translated for him at his second interview with police. He testified that the authorities did not tell him that he would be deported if he did not testify, but that was his understanding. The court then further questioned Morales-Fernandez, who stated that he believed he had signed a consent to deportation prior to testifying. The court then determined that Morales-Fernandez's immigration status was irrelevant because his consent removed the threat of deportation as leverage compelling him to testify.

Again, the district court's decision to admit or exclude evidence is reviewed for an abuse of discretion.[36] "However, the trial court's discretion is more narrow where bias is the object to be shown, and an examiner must be permitted to elicit any facts which might color a witness's testimony."[37] "Generally, '[t]he only proper restriction should be those inquiries which are repetitive, irrelevant, vague, speculative, or designed merely to harass, annoy or humiliate the witness.'"[38]

We conclude that the district court erred by refusing to allow Baltazar-Monterrosa's defense counsel the opportunity to impeach Morales-Fernandez's veracity, but we further conclude that the error was harmless beyond a reasonable doubt in light of the overwhelming physical evidence in the record, as well as Baltazar-

---

[36]*Collman v. State*, 116 Nev. 687, 704, 7 P.3d 426, 437 (2000).

[37]*Bushnell v. State*, 95 Nev. 570, 572, 599 P.2d 1038, 1040 (1979).

[38]*Lobato v. State*, 120 Nev. 512, 520, 96 P.3d 765, 771 (2004) (quoting *Bushnell*, 95 Nev. at 573, 599 P.2d at 1040).

Monterrosa's own admission to police about his involvement in the crimes.[39]

> *Sufficient corpus delicti evidence supports the robbery conviction*

Baltazar-Monterrosa argues that insufficient corpus delicti evidence supports his robbery conviction. Baltazar-Monterrosa contends that the only evidence that he robbed Werner was his own mistranslated statements to police.

"It has long been established that the corpus delicti must be demonstrated by evidence independent of the confessions or admissions of the defendant."[40]

> Confessions and admissions of the defendant may not be used to establish corpus delicti absent sufficient independent evidence. Once the state presents independent evidence that the offense has been committed, admissions and confessions may then be used to corroborate the independent proof. However, all other relevant evidence may be considered. The corpus delicti may be established by purely direct evidence, partly direct and partly circumstantial evidence, or entirely circumstantial evidence.[41]

Here, Werner's watch and ATM/check card were discovered between two mattresses in Baltazar-Monterrosa's room. At trial, Werner's daughter testified that Werner possessed these items on the afternoon of the day his body was discovered. We conclude that independent circumstantial evidence establishes the corpus delicti of a robbery committed by Baltazar-Monterrosa against Werner.

## CONCLUSION

We conclude that the district court did not abuse its discretion in admitting into evidence the videotaped police interviews containing the admissions of a non-English-speaker as translated by police interpreters. Although the translations were not word-for-word and contained additions and omissions, Baltazar-Monterrosa failed to show that the translations changed the fundamental nature of his confession and the parties stipulated to the overall accuracy of the translation. Because the remaining errors raised by Baltazar-

---

[39]*See Wegner*, 116 Nev. at 1155, 14 P.3d at 30.

[40]*Sheriff v. Dhadda*, 115 Nev. 175, 180-81, 980 P.2d 1062, 1065 (1999).

[41]*Sheriff v. Middleton*, 112 Nev. 956, 962, 921 P.2d 282, 286 (1996) (citations omitted).

Monterrosa either lack merit or are harmless, we affirm the judgment of conviction.

Douglas and Parraguirre, JJ., concur.